## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DONNIE CANTRELL,

      Plaintiff,

v.                           CIV 12-0129  KBM/SMV

BNSF RAILWAY COMPANY,
f/k/a Burlington Northern and
Santa Fe Railway Company

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on three motions, all filed by Defendant:  (1) Motion to Exclude the Testimony of Dr. Hugh Brock (*Doc. 32*) ("*Daubert* Motion"); (2) Motion for Partial Summary Judgment Dismissing Certain Claims Pursuant to the Statute of Limitations (*Doc. 33*) ("MPSJ"); and (3) Motion for Summary Judgment (*Doc. 34*) ("MSJ").  Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties consented to have me serve as the presiding judge and enter final judgment.  *Docs. 12, 13, 14.*

The Court has reviewed the parties' submissions and the relevant law and heard the arguments of counsel at a June 21, 2013 motions hearing. I found that Defendant's *Daubert* motion was well taken and that Dr. Brock's testimony must be excluded at trial.  Because the parties agreed that Plaintiff has no other expert evidence on the issue of causation, I further found that Defendant is entitled to summary judgment as a matter of law.  I therefore vacated the jury trial and

indicated that I would file this memorandum opinion and order setting forth my rationale for those rulings.  The parties requested and I agreed to also address the remaining issues raised in the MSJ and MPSJ for consideration in the event of an appeal.

## I.    BACKGROUND

Plaintiff was a Signal Maintainer for Defendant and its predecessor Atchison, Topeka and Santa Fe Railway Company ("AT&SF"), from 1979 until 2010, at various locations throughout its system of tracks.  *Complaint, Doc. 3* at ¶ 4; *MPSJ,*, *Doc. 33* at Undisputed Fact ("UF") ¶¶ 2, 3.  In this occupational injury action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*. Donnie Cantrell ("Plaintiff") alleges that while working for the railway company ("Defendant"), he was injured as a result of Defendant's unsafe and inadequate working conditions.  *Doc. 3* at ¶ 7.  Specifically, Plaintiff alleges that his employer negligently failed to provide him with:  (1) adequate tools to safely perform his job duties; (2) adequate manpower; and (3) proper training.  *MSJ*, *Doc. 34* at UF ¶¶ 2, 3.

Plaintiff maintains that as a result of the unsafe and inadequate work conditions, he suffered various injuries, including degenerative joint disease of the upper extremities, bilateral carpel tunnel syndrome, right ulnar neuropathy, bilateral knee joint degeneration resulting in surgical repair, degeneration of his lumbar spine, and hernia repair.  *Complaint* at ¶ 9.

The evidence before the Court is that Plaintiff suffered from lower back and knee pain associated with his work with Defendant throughout his career,

even pre-1996.  *MPSJ, Ex. 1*, at 27:3-28:4; 28:16-24; 49:2-16.  For instance,

Plaintiff sought medical attention on October 11, 2004, for acute low back pain

after a twisting incident that occurred at work, and he was prescribed pain

medication.  *MPSJ, Ex. 2*.  Weeks later, on October 28, 2004, Plaintiff underwent

an MRI, which showed a minor disk herniation injury at L4-5 and mild

degenerative disk disease at L5-S1.  *MPSJ, Ex. 3*.  Plaintiff knew at the time of

his 2004 MRI that his back injury was work-related.  *MPSJ, Ex. 1*, at 43:13-18.  In

2007, Plaintiff sought medical attention for "chronic knee problems."  *MPSJ,*

*Ex. 5.*  In 2008, Plaintiff reported knee pain in the past week or two that had

"gone away" and indicated that he was taking Vicodin from 2 to 2.5 times a day

for "chronic back problems."  *MPSJ, Ex. 7.*

The Court will address the issues raised in the three pending motions in

the following order.  First, in its *Daubert* Motion, Defendant asks the Court to

exclude the testimony of Plaintiff's expert witness, Dr. Hugh Brock ("Dr. Brock"),

on the grounds that his testimony is unhelpful to the jury, unreliable, and does not

comport with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Second, Defendant moves for summary judgment, arguing that Plaintiff has not

submitted evidence from which a reasonable trier of fact could determine that

Defendant was negligent or that its negligence caused Plaintiff's injuries.  Finally,

in its Motion for Partial Summary Judgment, Defendant moves for dismissal of

those of Plaintiff's claims that relate to his lower back and knee injuries,

contending that such claims are time-barred pursuant to 45 U.S.C. § 56.

## II.   LEGAL STANDARD

### A.   Rule 702 and *Daubert*

Federal Rule of Evidence 702 lays the foundation for the admissibility of

expert testimony, and provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  To determine whether an expert opinion is admissible under

Rule 702, a court must perform the following two-step analysis:

> 1.   The court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion, and
>
> 2.   If the expert is so qualified, the court must determine whether the expert's opinion is reliable and helpful under the principles set forth in *Daubert*.

*See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

### B. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute exists where the

evidence is such that a reasonable jury could resolve the issue either way.  *See*

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A mere scintilla of

evidence in the non-movant's favor is not sufficient.  *Anderson*, 477 U.S. at 252.

However, the court must consider all the evidence in the light most favorable to the party opposing summary judgment.  *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, parties may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Medlock v. United Parcel Service, Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard 'by identifying a lack of evidence for the nonmovant on [that] element.'" (internal quotation and citation omitted) (alteration in original)). Materials cited to establish the presence or absence of a genuine dispute must be in a form that would be admissible in evidence.  Fed. R. Civ. P.  56(c)(2).

## III.   ANALYSIS

### A.   Motion to Exclude Dr. Brock's Opinions

Plaintiff has offered the opinion testimony of Dr. Brock to establish a causal connection between Plaintiff's claimed injuries and his employment with Defendant.  Defendant concedes that Dr. Brock's education and experience sufficiently qualify him as an expert at the first step of the Rule of Evidence 702 analysis.  Rather, Defendant attacks the admissibility of Dr. Brock's opinions under the second step of that analysis, arguing that Dr. Brock's opinions should

be excluded under *Daubert* because the opinions are not based upon reliable scientific principles and methodologies, and the opinions will not assist the trier of fact.

Plaintiff maintains that while Rule 702 applies, *Daubert* does not, because Dr. Brock's opinions are not novel, unique, or controversial.  *Doc. 36* at 2.  Relying on *Compton v. Subaru of America, Inc.*, 82 F.3d 1513 (10th Cir. 1996), Plaintiff argues that "*Daubert* involved a novel scientific theory and therefore should only be applicable to novel scientific testimony."  *Id.*  Plaintiff insists that Dr. Brock's testimony is not novel.

In *Compton*, the Tenth Circuit indicated that after *Daubert* it had continued to apply the pre-*Daubert* Rule 702 analysis "except in cases involving unique, untested, or controversial methodologies or techniques."  *Compton*, 82 F.3d at 1519.  *Compton* held that in case where the expert evidence was "based solely upon experience or training," the court's *Daubert* gatekeeping function was not required.  *Id.* at 1518.

Significantly, however, the Tenth Circuit's decision in *Compton* was later overruled by *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  In *Kumho*, the United States Supreme Court held that a trial court must conduct its gatekeeping *Daubert* analysis for **all** expert testimony, not only for testimony predicated on some specific scientific methodology.  *Kumho Tire Co.*, 526 U.S. at 145; *see also United States v. Charley*, 189 F.3d 1251, 1261 n.11 (10th Cir. 1999) (recognizing that *Compton* was overruled by the Supreme Court's holding in *Kumho Tire* that courts must perform their gatekeeping function "with respect

to all expert testimony"). Indeed, since *Kumho Tire*, courts in the Tenth Circuit have readily applied the *Daubert* standard beyond novel, unique, or controversial expert testimony. *See, e.g., United States v. Gozxon-Chagal*, 885 F. Supp. 2d 1118, 1136 (D.N.M. 2012) (finding that the *Daubert* standard applies "to both novel expert testimony and well established propositions). Thus, under *Kumho Tire*, the Court concludes that it must exercise its gatekeeping function to assess the reliability and helpfulness of Dr. Brock's causation opinions.

### 1. Reliability

First, Defendant argues that Dr. Brock's opinions are not reliable under the factors provided in *Daubert*. In considering the reliability of any particular type of scientific knowledge, the trial court should consider the following non-dispositive factors: 1) testability; 2) error rate; 3) peer review and publication; and 4) general acceptance. *Daubert*, 509 U.S. at 593-94; *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 603 n.4 (10th Cir. 1997). The focus must be on the methodology, not on the conclusions generated. *Daubert*, 509 U.S. at 595. Additionally, the advisory notes to Rule 702 provide supplemental factors for consideration:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he conducted independent of the litigation, or whether he has developed his opinion expressly for the purposes of testifying; 2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 3) Whether the expert has adequately accounted for obvious alternative explanations; 4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; 5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee's note (2000 amends).

Plaintiff relies upon the "remedial nature" of FELA, claiming that it has a "significant effect on admissibility of expert testimony" and requires a more lenient application of *Daubert*.  While it is true that the causation standard is somewhat relaxed for claims brought under FELA,[1] the Tenth Circuit has applied standard *Daubert* analysis to expert opinions offered in FELA claims.  *See, e.g.*, *Summers*, 132 F.3d at 603.  Moreover, I agree with the reasoning of those courts that have concluded that the relaxed causation standard under FELA and the standard for admission of expert testimony "are distinct issues" that "do not affect one another."  *See, e.g.*, *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343, 1352 (M.D. Ga. 2007).  In other words, "the fact that FELA employs a relaxed standard of causation 'does [not] mean that in FELA cases courts must allow expert testimony that in other contexts would be inadmissible.'"  *Id.* at 1352.

Defendant urges the Court to follow the analysis of the court in *Bowers*, a FELA case in which the plaintiff brought an action against the railroad company for injuries to his back and neck, claiming that excessive vibration and a defective engineer's seat on a particular trip aggravated back and neck problems.  *Bowers*, 537 F. Supp. 2d at 1345.  There, the Middle District of Georgia excluded medical causation opinions of various physicians, finding them unreliable and unhelpful to a jury. *Id*.

The court's most comprehensive analysis of proposed expert causation opinions in *Bowers* was conducted with respect to the opinions of a non-treating

---

[11] In FELA cases, the test for causation is whether an employer's negligence played any part, even the slightest, in causing the alleged injury.  *Rivera v. Union Pac. R.R.*, 378 F.3d 502, 509 (5th Cir. 2004).

orthopedist who examined the plaintiff after referral by the plaintiff's attorney. The court determined that the non-treating orthopaedist's causation opinions were inadmissible under Fed. R. Evid. 702.  *Id.* at 1352. [2]

Applying the *Daubert* factors, the *Bowers* court concluded that the causation opinions lacked sufficient indicia of reliability because they were not testable, did not offer any error rate, were not peer-reviewed, and were not generally accepted.  *Id.* at 1354.   Additionally, the court concluded that under the advisory committee factors:  (1) the expert's opinion was not sufficiently independent of litigation such that the orthopaedist was essentially a "hired gun expert;" (2) he had unjustifiably extrapolated from the accepted premise that vibration can cause injury to the unfounded conclusion that an unknown amount of vibration caused the plaintiff's injury; (3) he failed to account for obvious alternative explanations; (4) that he failed to exercise the same care as he would in his work outside litigation consulting because he disregarded scientific standards and studies on vibration; and (5) he could not, even as an orthopaedist, reach a reliable opinion as to the effect of vibration on the plaintiff's pre-existing back problems without information as to the amount of vibration endured and the level of vibration that will cause a back injury.  *Id.* at 1355-59.

---

[2]  The court also excluded the causation opinions of two other physicians under Rule 702 in *Bowers*. It excluded the causation opinion offered by the plaintiff's operating surgeon, reasoning that it failed the five advisory committee factors for reasons similar to the opinions of the non-treating orthopaedist discussed above.  *See Bowers*, 537 F. Supp. 2d at 1364-66.  The court also excluded the causation opinion of a neurosurgeon, who had treated the plaintiff for neck and back problems *before* plaintiff was allegedly subject to excessive vibration.  *Id.* at 1368. Skipping the reliability analysis in favor of the helpfulness analysis, the court determined that the treating neurosurgeon's causation opinion – that the plaintiff *may* have injured his back while sitting on a locomotive seat – was too "weak and ambiguous" to be helpful to the trier of fact.  *Id.* at 1368-69.

The Court finds the *Bowers* reasoning exceedingly persuasive, and it applies equally in the instant case.

Further, in another FELA action, *Zarecki v. National R.R. Passenger Corp.*, 914 F. Supp. 1566 (N.D. Ill. 1996), the Northern District of Illinois excluded the causation opinion of the plaintiff's treating physician, which was submitted in the form of an affidavit, that the plaintiff's job activities caused her carpal tunnel syndrome. *Id.* at 1574-75. The court found the causation opinion unreliable, noting that the record failed to provide studies or analyses offered to substantiate the opinion or any indication that the opinion enjoyed general acceptance in the scientific community. *Id.* at 1574. The reasoning in *Zarecki*, too, is equally persuasive and applicable.

Based on the reports and deposition transcripts submitted in this case, it appears that Dr. Brock's causation opinions do not rest upon any discernable scientific methodology. For instance, Dr. Brock testified that he did not rely upon any studies or literature in reaching his opinions. *Doc. 32, Ex. 2*, at 32, 41. In fact, he testified that he did not, if fact, review the "NIOSH: Musculoskeletal Disorders and Workplace Factors" study that was referenced in his expert report. *Id.* at 25:12-16. Instead, he testified that his causation opinions were based upon "[m]y education, what has been taught to me, to a certain extent, albeit limited experience" and on "verbal instruction provided by my instructors through residency and to a certain extent medical school." *Id.* at 41:8-16. Additionally, he stated that the basis for his opinion regarding the aggravation of Plaintiff's knee problems was the general premise "that primary osteoarthritis is primarily a

wear-and-tear phenomenon." *Id.* at 32:10-12.  Plaintiff did not present any additional evidence at the June 21, 2013 hearing related to Dr. Brock's methodology or the basis for his opinions.  *Doc. 56.*  Putting it in terms of the *Daubert* factors, there is no suggestion that Dr. Brock's "methodology" is testable, has a particular error rate, was peer-reviewed, or is generally accepted.

Moreover, application of the advisory committee factors causes pause as to the reliability of Dr. Brock's opinions.  First, the record suggests that Dr. Brock's opinions did not grow naturally out of his own research but were instead formed for the purpose of litigation. There is no suggestion, for example, that Dr. Brock independently conducted **any** research on the topics for which he now offers causation opinions.  Indeed, Dr. Brock's attorney-authored final expert report contains opinions that dramatically differ from his original one paragraph opinion letter to counsel after seeing Plaintiff just one time.  This suggests that his final opinions were formed with a litigation purpose, and the circumstances indicate a lack of independence.

Second, the only *articulated* premise upon which Dr. Brock relies is the "general idea or theory that primary osteoarthritis is primarily a wear-and-tear phenomenon."  *Doc. 32, Ex. 2*, at 32.  From that premise, he concludes that Plaintiff's work activities, which were described to him by Plaintiff's counsel, without indication of the frequency or duration of such activities, aggravated Plaintiff's knee problems.  Absent an understanding of the frequency or duration of particular work tasks, this is an unjustified extrapolation from an accepted premise to an unfounded conclusion.

Third, although Dr. Brock did note in his final report that Plaintiff participated in martial arts, acknowledging that it had been a factor in his chronic back issues, there is no indication that Dr. Brock considered the extent of Plaintiff's martial arts participation or his guitar-playing in forming his causation opinions as to either the back, knee or carpel tunnel conditions.  Finally, Dr. Brock's failure to rely upon or even indicate familiarity with studies about the aggravation of medical conditions by repetitive activities suggests that he may not have offered the same level of care in offering his causation opinions as he would in his practice as a physician.

In response, Plaintiff argues that under Rule 702, Dr. Brock's medical training is a sufficient basis for his causation opinion.  Plaintiff references the portion of Rule 702 providing that "a witness who is qualified as an expert, by knowledge, skill, experience, training or education may testify."  *Doc. 36* at 9. However, this part of the Rule again relates only to the first step in the Court's *Daubert* analysis (i.e. whether an expert is qualified) and does not address whether the expert's opinion is based upon a reliable methodology.

Plaintiff also cites two Ninth Circuit cases, *Sementilli v. Trinidad Corporation*, 155 F.3d 1130 (9th Cir. 1998) and *Kennedy v. Collagen Corporation*, 161 F.3d 1226 (9th Cir. 1998), to support his position that Dr. Brock's causation opinion may properly be based upon only his experience and his review of medical records.  The Ninth Circuit has apparently at times allowed medical experts to offer opinions based only upon experience and medical-records review, rather than on any particular scientific methodology.  *See, e.g.*,

*Kennedy*, 161 F.3d at n.1.  *But see Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499 (9th Cir. 1994) (excluding expert testimony of two doctors because they failed to show that they used scientific methods and procedures in reaching their opinions).  However, there is no indication that the Tenth Circuit has likewise excused medical doctors from demonstrating a reliable methodology under the principles of *Daubert*.  *See Summers,* 132 F.3d at 604; *see also Farris v. Intel Corp.*, 493 F. Supp. 2d 1174, 1180 BB/WDS (D.N.M. 2007) (excluding a medical doctor's expert testimony in a toxic tort case because the doctor did not note any peer reviewed evidence and failed to account for other potential causes of the plaintiff's injuries).

Most significantly, this Court questions the reliability of Dr. Brock's opinions because his deposition testimony suggests that most of his report was actually authored by Plaintiff's counsel rather than by Dr. Brock himself.  Dr. Brock testified that he wrote the one paragraph opinion letter ("original report") at the request of counsel.  In response, Plaintiff's attorney, Mr. Sassaman, provided Dr. Brock with the final expert report at issue which Dr. Brock characterized as "proposed amendments that I approved of."  *Doc. 32, Ex. 2* at 10:7-10.

Dr. Brock, however, testified that despite the representations in the final report, he did not review many of the documents referenced in the report or draft critical portions of the report. *Doc. 32, Ex. 2* at 5:6-6:0; 9:19-14:14; 25:7-20.  In Dr. Brock's "original report," he offered only the relatively vague and equivocal opinion that "[i]t is always difficult to say if arthritis or nerve compression is due to repetitive work activities.  Whereas this is a reasonable statement to make, it is

13

also possible that these afflictions could have arisen in the absence of his work environment." *Doc. 32, Ex. 3.*  Thereafter, in the attorney-drafted version of Dr. Brock's report, his opinions were as follows:  1) "[I]t is reasonable to say that prolonged climbing, kneeling on rocks and concrete and carrying heavy items certainly were contributing and aggravating factors to [Plaintiff's] condition"; 2) "His repetitive work activities and exposure to vibration are clearly aggravating factors and contributed to his condition."; and 3) "I can say that his long term strenuous work was a contributing factor that could aggravate pre-existing conditions." *Doc. 32, Ex. 1.*  The altered opinions offered in Dr. Brock's final expert report are clearly more definitive and less equivocal than the opinion that he initially offered to Plaintiff's counsel.  Although Dr. Brock *did* adopt and sign off on the opinions drafted by Plaintiff's counsel, Dr. Brock's deposition testimony casts significant doubt as to the reliability of the opinions offered therein, especially given his failure to otherwise offer significant explanation of his methodology.  *See O'Hara v. Travelers*, No. 11cv208, 2012 U.S. Dist. LEXIS 104048, 2012 WL 3062300, at *23-24 (D. Miss. July 26, 2012) (finding an expert's opinions unreliable because there was evidence that he did not write the report and did not review the documents listed therein).

### 2.  Helpfulness

Defendant also maintains that Dr. Brock is not familiar enough with the facts of the underlying case to offer expert opinions that would be helpful to the trier of fact.  Helpfulness to the trier of fact is determined by evaluating whether

the testimony is relevant and whether the "methodology properly can be applied to the facts in issue." *Summers*, 132 F.3d at 603 (10th Cir. 1997).

According to Defendant, Dr. Brock failed to obtain the necessary and complete description of Plaintiff's job -- to include details of exposure, duration, and force -- and he is therefore unable to opine as to how Plaintiff's job duties specifically aggravated or caused his injuries. *See Meyers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010) (excluding the opinions of the plaintiff's medical providers in a FELA case because the providers were essentially offering general medical opinions without any methodology about the plaintiff's condition under the mere assumption that the condition developed over time with the railroad). Absent any evidence demonstrating Dr. Brock's understanding of Plaintiff's work tasks, including the tools Plaintiff worked with, the repetitive motions he performed, the duration of those tasks, and how those tasks aggravated his neck, back, and carpal tunnel issues, the Court finds that Dr. Brock's causation opinions are not helpful to a jury.

Furthermore, Dr. Brock has not provided any quantification or guidance as to the extent that Plaintiff's job duties aggravated or contributed to his underlying injuries. Instead he testified that Plaintiff's work duties aggravated his underlying conditions by "perhaps causing flareups – flareups and pain, and contributing in the sense that that led to the progression of cartilage degeneration." *Doc. 32, Ex. 2,* at 36:8-19. At the June 21, 2013 motions hearing, counsel for Plaintiff represented that Dr. Brock would not offer any testimony to quantify or itemize the aggravation caused by Plaintiff's job duties and that it would be up to the jury

to apportion damages.  *Doc. 56.*  The Court finds that Dr. Brock's failure to

provide any guidance as to the extent of aggravation of Plaintiff's injuries also

renders his opinion unhelpful to a trier of fact.  *See Doc. 32, Ex. 2*, at 36:1-19.

### 3.   Conclusion

Based upon the record before the Court, Plaintiff has failed to demonstrate

that Dr. Brock's causation opinions are either reliable or helpful to a trier of fact

under the second prong of the *Daubert* analysis.  For these reasons, the Court

will exclude the causation opinions of Dr. Brock for failure to satisfy Federal Rule

of Evidence 702.

### B.  Defendant's Motion for Summary Judgment

Under FELA, railroad companies are liable in damages to any employee

who suffers injury due to the railroad's negligence.  45 U.S.C. § 51.  To recover

under FELA, the plaintiff must prove the common law elements of negligence,

including duty, breach, foreseeability, and causation.  *Fulk v. Illinois Cent. R.R.

Co.*, 22 F.3d 120, 124 (7th Cir. 1994).  The Court must now address whether the

Plaintiff's admissible evidence creates a material issue in dispute as to these

elements that would preclude the entry of summary judgment.

### 1.   Causation

Defendant argues that Plaintiff is without any evidence of causation of his

injuries because 1) Dr. Brock's opinion is inadmissible under Rule 702; and 2) Dr.

Brock will not opine that Plaintiff's work activities caused his injuries but will, at

most, opine that they aggravated them.  Plaintiff incorporates his Response to

Defendant's Motion to Exclude and states as follows: "In order to show the

causal connection between the complained of injuries and Plaintiff's job duties, the Plaintiff intends to call Plaintiff's treating doctor, Hugh Brock, M.D." *Doc. 41* at 13.  The Court has excluded Dr. Brock's causation opinion herein.  *See, supra*, Part III.A.3.  Without Dr. Brock's causation opinion, Plaintiff otherwise lacks evidence that the negligence of Defendant played any part in causing his injuries.

Moreover, even if the Court had not excluded Dr. Brock's opinions under Rule 702, the Court questions, given the equivocal and imprecise nature of these opinions, whether a reasonable jury would be able to conclude *by a preponderance of the evidence* that Plaintiff's injuries, or the aggravation of his injuries, were indeed caused by the negligence of Defendant.  *See Doc. 32-2* at 5 (Dr. Brock's deposition testimony acknowledging, "I can't say with greater than 50 percent certainty that his work duties caused his condition.).

### 2. Negligence

Defendant also argues that Plaintiff has offered no admissible evidence, other than his self-serving allegations/testimony, that BNSF was negligent or that its negligence caused his injuries.  In response, Plaintiff notes the "featherweight burden" necessary to submit an FELA case to the jury and contends that he has provided evidence to create a genuine issue of fact as to Defendant's negligence and causation.

In order to establish the breach of a duty to provide a reasonably safe place to work under FELA, a plaintiff must present evidence that the railroad knew or should have known about unsafe conditions.  Here, Plaintiff does not offer any expert testimony regarding workplace safety, relying instead upon his

own testimony to establish Defendant's negligence. Plaintiff argues that he has presented evidence that Defendant 1) provided inadequate manpower, 2) provided inadequate tools, and 3) failed to warn regarding repetitive stress injuries.

For his inadequate manpower claim, Plaintiff refers to his own testimony that he and the other signalmen were constantly by themselves in territories that were "too big," that additional help was not assigned when a "surfacing gang" went through the territory and created additional work by tearing up the track circuits and shunts on the crossing, and that the lack of adequate help caused him to be exposed to repetitive tasks (e.g., kneeling, bending).  Defendant, in response, references Plaintiff's testimony that "[a]dditional manpower would have been wonderful," claiming that such testimony is *not* evidence that additional manpower was *required* because of the work duties.  However, Plaintiff also testified that "my argument with the railroad's always been we need help" and "[t]he territories are too big.  They're way too big."  *Doc. 41, Ex. A*, at 97:18-25; 98:1-21; 99:17-20.  Additionally, Plaintiff referred to Defendant's failure to provide extra help after a "surfacing gang" went through as a "safety issue."  *Id.* at 115:10-24.

For his inadequate tools claim, Plaintiff refers to his own testimony that he was forced to climb poles because bucket trucks were reserved for younger employees, that he was given a manual line auger rather than a battery-powered one, and that some tools (e.g., jackhammer, tamper, drills, impact guns) were heavy and difficult to use. Defendant counters that the standard is whether the

equipment provided was "reasonably safe," not whether the railroad could have used a safer alternative method.  It argues that Plaintiff has provided no evidence that the methods and equipment used by Defendant were inherently unsafe.

Finally, for his failure to warn of repetitive stress injuries claim, Plaintiff again refers to his own testimony, which he claims establishes that Defendant did not warn or test for repetitive stress injuries.  However, as Defendant notes, the referenced testimony only indicates that Defendant did not conduct electric nerve testing.  Plaintiff does not provide any evidence suggesting that he was not warned about cumulative stress injuries.

While it is a close case, the Court concludes that the evidence offered by Plaintiff in support of his negligence claim – that is, his own deposition testimony concerning inadequate manpower, inadequate tools, and failure to warn -- while relatively weak and conclusory is sufficient to create a genuine issue of fact in the context of this FELA action.  Although some courts have granted summary judgment in favor of railroads in similar situations,[3] I am cognizant of the FELA "featherweight burden" and the expressed Congressional intent that FELA cases be resolved by a jury.  I therefore conclude that Plaintiff has created a question of fact as to Defendant's breach of a duty to provide Plaintiff with a safe workplace.

---

[3] *See, e.g., Lewis v. CSX Transp., Inc.*, 778 F. Supp. 2d 821, 837-40 (S.D. Oh. 2011) (concluding that the plaintiff failed to create a question of fact because 1) as to his inadequate tools claim, the mere fact that the Plaintiff thought newer equipment was easier to use did not indicate that the old equipment was unreasonably safe; and 2) as to the inadequate manpower claim, the plaintiff only testified that he often worked overtime and did not testify that he was unreasonably required to perform tasks that would have usually required more assistance); *see also Zarecki v. Nat'l R.R. Passenger Corp.*, 914 F. Supp. 1566, 1572 (N.D. Ill. 1996) (concluding that the plaintiff failed to raise a genuine issue of material fact as to unsafe working conditions, where the only evidence offered to support her claim of inadequate equipment was her own  testimony that the defendant did not provide her with an adjustable keyboard or chair without armrests, and the only evidence offered to support her claim that she was required to perform her job in an unsafe manner was her own description of her work tasks).

For all of these reasons, the Court concludes that Defendant is entitled to summary judgment in its favor.

### C. Defendant's Motion for Partial Summary Judgment

As explained above, Defendant also asks the Court to address, in the event of an appeal, whether the relevant statute of limitations would also bar Plaintiff's claims for lower back and knee injuries. Defendant asserts that Plaintiff knew or had reason to know of the existence and cause of chronic back and knee pain more than three years before filing suit. To maintain a claim under FELA, the plaintiff must allege and prove that the action was filed "within three years from the day the cause of action accrued." 45 U.S.C. § 56. Thus, Plaintiff's cause of action is time-barred if it accrued before February 9, 2009, three years before the filing of his complaint on February 9, 2012.

FELA does not define when a cause of action accrues. *Matson v. Burlington Northern Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001). However, the Tenth Circuit has held that in "cases involving latent injuries which cannot be discovered immediately or those where the injury has an indefinite onset and progresses over many years unnoticed," the discovery rule defines when the FELA cause of action accrues. *Id.* at 1235. Under the discovery rule, the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence *and* cause of the injury which is the basis of the action. *Id.* The discovery rule imposes upon a plaintiff an affirmative duty to exercise reasonable diligence and to investigate the cause of a known injury. *Id.*

With regard to the *existence* of the injury, a FELA cause of action accrues when the effects of the condition manifest themselves.  *Robinson v. BNSF Railway Co.*, 412 Fed. Appx. 113, *7 (10th Cir. 2011).  Manifestation, however, does not mean that the plaintiff knows the precise nature or medical origin of the injury.  *Id.*  Instead, the condition manifests itself when the plaintiff is "apprised of the general nature of the injury." *Id.*  Lack of knowledge of the injury's permanence, extent, or ramifications does not toll the statute.  *Gustavson v. United States*, 655 F.2d 1034, 1036 (10th Cir. 1981).  With regard to the *cause* of the injury, a FELA cause of action accrues when the plaintiff knows or has reason to know that "his injury is merely work related."  *Matson*, 240 F.3d at 1236.  As a result, here, Plaintiff must have known, or with reasonable diligence should have known, before February 9, 2009, that he had suffered cumulative injuries to his back and knees and that those injuries were related to his work for Defendant.

Plaintiff contends that his injuries did not manifest themselves as a cumulative/permanent injury until after February 9, 2009.  Plaintiff suffered from lower back and knee pain associated with his railroad work throughout his career and sought medical attention on October 11, 2004, for acute low back pain after a twisting incident at work.  Weeks later, on October 28, 2004, Plaintiff underwent an MRI, which showed a minor disk herniation injury at L4-5 and mild degenerative disk disease at L5-S1.  Thus, Plaintiff knew at the time of his 2004 MRI that his back injury was work-related.  Moreover, in 2008, Plaintiff indicated

that he was taking Vicodin from 2 to 2.5 times a day for "chronic back problems." Additionally, in 2007, Plaintiff sought medical attention for chronic knee problems.

Plaintiff testified that he attributed his back and knee problems to ordinary aches and pains associated with manual labor, rather than to an injury.  In this regard, Plaintiff suggests that his situation is nearly indistinguishable from the plaintiff in *Sandoval v. Union Pacific R.R. Co.*, 396 F. Supp. 2d 1269 (D.N.M. 2005).  In *Sandoval*, a FELA case, District Judge Bruce Black determined that the issue of whether the plaintiff knew of the existence and cause of his injury more than three years before filing suit was a question of fact not appropriate for resolution on summary judgment.  *Id.* at 1272.  Making a distinction between pain and injury, Judge Black reasoned that although there was evidence that the plaintiff had been experiencing pain for more than three years before filing suit, there was a factual issue as to whether he should have sought medical attention sooner in order to determine that he had suffered an *injury*.  *Id.* at 1273. According to Judge Black, the proper inquiry was when the plaintiff knew or should have known that the pain he experienced was due to injuries from work rather than the aging process or commonplace muscle soreness due to physical exertion.  *Id.* at 1274.

With respect to Plaintiff's lower back injury, *Robinson v. BNSF Railway Co.*, 412 Fed. Appx. 113 (10th Cir. 2011) is instructive.  In *Robinson*, the Tenth Circuit noted that the plaintiff's diagnosis of degenerative cervical and lumbar disk disease was, by definition, permanent and only going to worsen over time without medical treatment. *Id* at 117.  The court reasoned that the accumulated

effects of his working conditions had manifested themselves in the form of a medical diagnosis (i.e. degenerative disk disease) such that the plaintiff knew or should have known the general nature of his alleged cumulative injury.  *Id.*  Here, Plaintiff was diagnosed with mild degenerative disk disease in 2004.

In order to grant summary judgment, there must be no genuine issue of material fact as to when the plaintiff's cause of action accrued.  Following the reasoning in *Sandoval*, the Court concludes that an issue of fact remains as to when Plaintiff knew or should have known that the pain he experienced in his knees was due to injuries from work rather than the aging process or commonplace soreness due to physical exertion. In contrast, following the reasoning in *Robinson*, Plaintiff's 2004 diagnosis of degenerative disk disease should have placed him on notice of the general nature of his alleged cumulative injury to his lower back.  As a result, even if Plaintiff had offered admissible causation evidence to support his FELA claim, the Court finds that his claim for injury to his lower back, or aggravation of a prior lower back injury, is barred by the applicable statute of limitations.

**Wherefore,**

**IT IS HEREBY ORDERED** that Defendant's Motion to Exclude the Testimony of Dr. Hugh Brock *(Doc. 32)* and Motion for Summary Judgment *(Doc. 34)* are well-taken and will be **granted**.  In the alternative, Defendant's Motion for Partial Summary Judgment on the basis of a statute of limitations bar *(Doc. 33)* is well-taken in part and will be **granted in part**.

**IT IS FURTHER ORDERED** that final summary judgment in favor of

Defendant enter concurrently herewith dismissing all claims with prejudice.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE